**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA**

| | | | |
|---|---|---|---|
| PAULI COFFEY, | | ) | |
| | | ) | |
| | Plaintiff, | ) | |
| vs. | | ) | 1:04-cv-1398-SEB-VSS |
| | | ) | |
| STARBUCKS, INC., | | ) | |
| | | ) | |
| | Defendant. | ) | |

**Entry Discussing Motions for Summary Judgment**

For the reasons explained in this Entry, the defendant's motion for summary judgment, filed on April 15, 2005, must be **granted,** and the plaintiff's motion for summary judgment, filed on May 6, 2005, must be **denied.**

Pauli Coffey ("Ms. Coffey") alleges that her former employer, Starbucks Coffee Company ("Starbucks"), discriminated against her on the basis of gender when it failed to train her, denied her promotions, and terminated her employment. She further alleges that Starbucks retaliated against her when she "stood up to" her supervisor, when she called the company Helpline, and when she filed a charge of discrimination.

## I. Summary Judgment Standard

Starbucks seeks resolution of Ms. Coffey's claims through the entry of summary judgment. Pursuant to Rule 56(c) of the *Federal Rules of Civil Procedure*, summary judgment is to be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." To survive summary judgment, the non-movant must set forth "specific facts showing that there is a genuine issue for trial." **FED.R.CIV.P.** 6(e). "Factual disputes are 'genuine' only 'if the evidence is such that a reasonable jury could return a verdict for the [non-movant].'" *Oest v. Illinois Dept. of Corrections,* 240 F.3d 605, 610 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

Because the defendant seeks the entry of summary judgment and because Ms. Coffey is proceeding without counsel, the notice required by *Lewis v. Faulkner,* 689 F.2d 100 (7th Cir. 1982) and Local Rule 56.1, was issued. Through this notice, Ms. Coffey was notified of the nature of the defendant's motion, of the proper manner in which to respond, and of the consequences of failing to respond. Ms. Coffey has responded with argument and evidence.

## II. Findings of Fact and Conclusions of Law

### A. Findings of Fact

On the basis of the pleadings and the expanded record, and specifically on the portions of that record which comply with the requirements of Rule 56(e), the court makes the following findings of fact:

Starbucks corporate headquarters is located in Seattle, Washington. The facility at which Ms. Coffey worked is located at 420 N. Massachusetts Avenue, Indianapolis, Indiana 46204 ("Store No. 2551"). Starbucks is the leading purveyor of premium coffee products in the United States and has stores located throughout the world.

Ms. Coffey was employed by Starbucks from August 7, 2002, until January 25, 2004.

Starbucks has a policy that employees must be treated without regard to sex, race or any other legally protected characteristic. Starbucks also has a policy that prohibits retaliation against any employee who expresses concerns about discrimination or harassment. Starbucks has a "Retail Dress Code Policy" and an "Attendance and Punctuality Policy."

Michael Dobosz ("Mr. Dobosz") has been employed by Starbucks since approximately July of 2001. From approximately July of 2001 to May of 2003, he served as the Store Manager at Store No. 2551. From on or about August 7, 2002, to on or about May 27, 2003, Mr. Dobosz served as Ms. Coffey's immediate supervisor. Since July of 2003, Mr. Dobosz has been employed as a District Manager. In this position, he is responsible for supervising a number of stores in the Indianapolis area. Store No. 2551 is not within his district and he has no control over the operation of that store.

Elisabeth Horneffer ("Ms. Horneffer") has been employed by Starbucks since approximately June of 2001. From on or about May 26, 2003, to on or about August 4, 2003, Ms. Horneffer was the Assistant Store Manager and Interim Store Manager at Store No. 2551. In that role, she served as Ms. Coffey's immediate supervisor. During all relevant periods, Ms. Horneffer used the last name "Fink," her maiden name, but for purposes of this Entry, she will be referred to as "Ms. Horneffer."

Mary Marrion ("Ms. Marrion") has been employed by Starbucks since approximately June of 2003. Ms. Marrion has held the position of Store Manager at Store No. 2551 since on or about August 4, 2003. Ms. Marrion served as Ms. Coffey's immediate supervisor from August of 2003 to January of 2004.

At Starbucks, the Human Resources function is referred to as "Partner Resources." Angela Bailey ("Ms. Bailey") has been employed by Starbucks since approximately May of 2002. Ms. Bailey has held the position of a Partner Resources Manager in Indianapolis, Indiana since January of 2004. From May of 2002 to January of 2004, Ms. Bailey served as a District Manager. In that position, she supervised a number of stores, including Store No. 2551 where Ms. Coffey was an employee.

Andrea Levis ("Ms. Levis") has been employed by Starbucks since approximately May 1996. Ms. Levis has held the position of a District Manager in Indianapolis, Indiana since January of 2004. As the District Manager, Ms. Levis is responsible for supervising a number of area stores, including Store No. 2551, where Ms. Coffey was an employee.

Mr. Dobosz interviewed Ms. Coffey and ultimately hired her on August 7, 2002, as a Barista. In that role, Ms. Coffey had a frontline job. Baristas ensure that service and store standards are met and are to provide prompt service and beverages of consistent quality.

Barista evaluations are rated from 1 to 3: 1 = "Needs Improvement;" 2 = "Meets Expectations;" and 3 = "Consistently Exceeds Expectations." Ms. Coffey received an overall score of 1.94 (out of 3) on her first Performance Review in May of 2003. She received a "1" or "needs improvement" in the areas of consistently following recipes and in contributing to a positive team environment. The review also noted problems with her lack of adherence to the dress code as well as a need for more positive interaction with her co-workers and in taking initiative for personal learning. She received a "3" or "consistently exceeds expectations" in the areas of anticipating and communicating any foreseeable problems, and in cash handling and safety and security procedures. It was further noted that Ms. Coffey picked up shifts whenever asked to stay longer, was great with customers and had a great rapport with regular customers, and was dependable in working the opening shift. Ms. Coffey received a Corrective Action Notice on June 10, 2003, for being late to work.

In August of 2003, Ms. Coffey received an overall score of 1.775 (out of 3) on her second performance review, which was administered by Ms. Horneffer, the interim Store Manager. Ms. Coffey received a "1" or "needs improvement" in needing to be more positive and needing to assist with new employee training and coaching. Ms. Coffey was asked to make sure to always follow the Starbucks Mission Statement, to get along with everyone, and to be more positive towards the dress code and personal hygiene issues. She received a "3" in the area of customer service, knowing her customers and knowing their drinks.

On May 20, 2003, Mr. Dobosz, the Store Manager at Store No. 2551 at the time, met with Ms. Bailey to discuss a problem pertaining to Ms. Coffey's attendance. Ms. Coffey's co-workers, including her Shift Supervisors, had informed Mr. Dobosz that Ms. Coffey had

a recurring habit of leaving the store in the middle of her shift to take care of personal business that she would characterize as "an emergency." Although Ms. Coffey characterized her absences as emergencies, they were absences that perhaps could have been avoided with a bit of advance planning on her part. The personal business that Ms. Coffey left mid-shift to attend to included driving her children to school, taking a forgotten item to her children's school, and taking care of car problems. On May 20, 2003, Ms. Coffey told her co-workers that she had to leave the store, and again characterized her absence as an "emergency." It turned out that the "emergency" that day was going to her children's school, one more absence that Ms. Coffey's co-workers felt could have been avoided with proper planning. Ms. Coffey's co-workers expressed their frustration to Mr. Dobosz, explaining that her leaving the store mid-shift was disruptive to business, and that it had become too regular an occurrence for them to accommodate her unscheduled departures during peak business hours. Ms. Bailey advised Mr. Dobosz to counsel Ms. Coffey about her mid-shift absences and suggested that he memorialize the conversation in a memorandum to be placed in Ms. Coffey's personnel file. Shortly thereafter, Mr. Dobosz met with Ms. Coffey and drafted a memorandum, which was signed by both him and Ms. Coffey, by Ms. Coffey "in protest."

The memorandum documented the conversation between Mr. Dobosz and Ms. Coffey concerning her "leaving her scheduled shift."  It indicated that if she left her shift without consent from her Shift Supervisor, corrective action would be given. It further indicated that Shift Supervisors had been instructed to not allow Ms. Coffey to leave if it affected store business in a negative way.  Because Ms. Coffey misunderstood the intent of the memorandum, and thought it was a "restrictive policy" applicable only to her, Ms. Bailey met with her and nullified the memorandum on June 10, 2003.

Ms. Coffey called the Starbucks employee Helpline on three separate occasions: May 20, 2003, May 26, 2003, and May 28, 2003.  During those calls, she complained about the memorandum drafted by Mr. Dobosz, about her fear that her hours were going to be cut, and about her hours actually being cut.

In May 2003, Mr. Dobosz obtained another position within the company. His last day as Store Manager at Store No. 2551 was on or about May 27, 2003. At that time, Ms. Horneffer, the Assistant Store Manager, assumed the role of interim Store Manager at Store No. 2551. After Ms. Horneffer assumed management of the store, Mr. Dobosz had no control over anyone's schedule at Store No. 2551.

On or about May 28, 2003, Ms. Bailey received a call from Ms. Coffey informing her that she had been scheduled outside of her availability for the week of June 2, 2003. After investigating the matter, Ms. Bailey learned that this had been done mistakenly by Ms. Horneffer. Ms. Bailey communicated the issue to Ms. Horneffer, and Ms. Horneffer immediately adjusted Ms. Coffey's schedule.

Until the latter part of 2003, no formal training was necessary for a Barista to become a Shift Supervisor. Generally, a Barista who had been employed with Starbucks for at least six (6) months and had a rating of at least "Meets Expectations" (2 out of 3) could be considered for a promotion to a Shift Supervisor if an opening existed.

In or about the fall of 2003, the promotion process became more formal. A Barista who was interested in being promoted would express his or her interest to the Store Manager, who then would work with the employee to form a Personal Development Plan ("PDP"). Thereafter, the employee would participate in a learning coach class, where he or she would learn to train newly-hired employees to become Baristas. At this point, assuming there was an open Shift Supervisor position, the employee would then interview with the District Manager, who would decide whether the person should be trained and promoted. If the District Manager approved, then the employee would attend a Shift Supervisor training class. Upon successful completion of the training, the District Manager would certify the employee as being ready to fulfill the Shift Supervisor position.

In late 2003, Ms. Coffey approached Ms. Marrion about receiving the training necessary to move from her Barista position to Shift Supervisor. Ms. Marrion informed Ms. Coffey that there was no need for another Shift Supervisor at Store No. 2551, but offered to call other stores in the area to see if any had a need for an additional Shift Supervisor. Ms. Coffey refused the offer, stating that she was only interested in working at Store No. 2551.

In or about July of 2003, the decision was made to promote Mr. Harold Romerill ("Mr. Romerill") to Shift Supervisor. The actual promotion took place in October of 2003. The ultimate decision to promote a Barista to Shift Supervisor is that of the District Manager. As the District Manager for Store No. 2551 at the time, Ms. Bailey was the person primarily responsible for promoting Mr. Romerill to Shift Supervisor. Ms. Horneffer, the interim Store Manager at the time, was also involved in the decision to promote Mr. Romerill. Ms. Horneffer and Ms. Bailey decided to promote Mr. Romerill because he was the best person for the position. When compared with Ms. Coffey, Mr. Romerill had more experience (he was hired as a Barista three (3) months prior to Ms. Coffey), had already met with Ms. Bailey to discuss his interest in a Shift Supervisor position (Ms. Coffey had not done so at the time), and most importantly, had superior performance reviews. Whereas Ms. Coffey had performance review scores of 1.94 and 1.775 (out of 3), respectively, Mr. Romerill had a score of 2.73 (out of 3). Also, on his first review (which was done before the ratings were scored 1 to 3), Mr. Romerill was noted to be an exceptional worker. In addition, as of his promotion on October 1, 2003, Mr. Romerill's file contained no Corrective Action Notices.  Given her performance problems, including disrupting Starbucks business operations due to her mid-shift absences, Ms. Coffey was not eligible for a promotion at the time the decision was made to promote Mr. Romerill nor was she considered for the position.

5

The incident that led to Ms. Coffey's termination occurred on January 22, 2004. On that day, Ms. Levis, the District Manager, visited Store No. 2551. Ms. Coffey, Mary (Betsy) Pratt ("Ms. Pratt") (co-worker), Debbie Modrowski ("Ms. Modrowski") (Shift Supervisor), and Ms. Marrion (Store Manager) were present. Ms. Marrion asked Ms. Coffey to tuck in her shirt and Ms. Coffey began arguing that she was wearing a sweater, not a shirt, so it did not have to be tucked in.  Ms. Coffey eventually partially complied by tucking in only the back of her shirt. Ms. Marrion left the room, but was later informed by Ms. Pratt and Ms. Modrowski that Ms. Coffey became very upset and acted unprofessionally in front of customers. Ms. Marrion later informed Ms. Levis that Ms. Pratt and Ms. Modrowski had reported a very serious problem with Ms. Coffey's behavior. Over the next three (3) days, Ms. Levis conducted an investigation into the matter and discovered that Ms. Coffey had shown a lack of composure demonstrated by the use of inappropriate language (cursing in front of customers), engaging in inappropriate actions (slamming equipment in front of customers), and the failure to treat customers with respect and dignity (the use of inappropriate language in the presence of customers and voicing disinterest in interacting with the customers).

As part of Ms. Levis' investigation, she discussed the matter with Ms. Bailey, the Partner Resources Manager and former District Manager for Store No. 2551. Ms. Levis informed Ms. Bailey that, given the seriousness of this incident, she thought it was best to terminate Ms. Coffey. Ms. Bailey agreed, especially in light of Ms. Coffey's performance history, including, but not limited to, the fact that Ms. Coffey had been counseled on more than one occasion to follow the dress code and personal appearance standards. On January 25, 2004, Ms. Levis and Ms. Marrion called Ms. Coffey into the office and terminated her employment.

Ms. Coffey filed an EEOC charge of discrimination based on sex on or about November 7, 2003, alleging that a male co-worker was promoted over her. She also complained about remarks made by Mr. Dobosz and the May 20, 2003, memorandum issued by Mr. Dobosz. Ms. Coffey filed her second EEOC charge of discrimination on or about February 3, 2004, alleging that she was discriminated against on the basis of sex when her employment was terminated and was retaliated against for filing a charge of discrimination. In April 2004, after a hearing, an Administrative Law Judge determined that Ms. Coffey had been discharged without just cause and was entitled to receive unemployment insurance benefits because Ms. Marrion testified on behalf of Starbucks that she did not personally witness Ms. Coffey's behavior on January 22, 2004, and Ms. Coffey denied the allegations. On or about May 25, 2004, the EEOC informed Ms. Coffey by phone that its investigation was complete and that the evidence failed to show that Starbucks' conduct was discriminatory or retaliatory. On or about May 26, 2004, the EEOC issued "Dismissal and Notice of Right to Sue" letters to Ms. Coffey.

## B.  Conclusions of Law

Title VII of the Civil Rights Act of 1964 provides that it "shall be an unlawful employment practice for an employer - - to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin... . " 42 U.S.C. § 2000e-2(a)(1). Title VII also provides that an employer may not take an adverse employment action or discriminate against an employee because she has made a charge under the statute or undertaken other protected activity. See 42 U.S.C. § 2000e-3(a); *Fine v. Ryan International Airlines,* 305 F.3d 746, 751 (7th Cir. 2002).

### 1.     Gender Discrimination

"It is well-established that a plaintiff in a Title VII case may proceed under a direct or indirect method of proof." *Butts v. Aurora Health Care,* 387 F.3d 921, 924 (7th Cir. 2004); see also *Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 644 (7th Cir.), *cert. denied*, 537 U.S. 879 (2002). Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption. *Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003); *Plair v. E.J. Brach & Sons, Inc.,* 105 F.3d 343, 347 (7th Cir. 1997).

Ms. Coffey alleges that she was discriminated against on the basis of sex by not being trained for a promotion nor promoted to Shift Supervisor.  She also alleges she was discriminated against when her employment was terminated.[1]

---

[1]Ms. Coffey states in her deposition that on or about May 12, 2003, when she informed Mr. Dobosz of a male co-worker's alcohol abuse, Mr. Dobosz stated that "women and people of color are great employees so long as they know their place, and you don't know your place."  She alleges that she stood up to him and responded by saying, "Yes I do." She believes this prompted Mr. Dobosz to write the memorandum on May 20, 2003. "Racial epithets or stray remarks may be direct or circumstantial evidence of intentional discrimination if they are sufficiently connected to the employment decision, i.e., made by the decisionmaker, or those who influence the decisionmaker, and made close in time to the adverse employment decision." *Dandy v. United Parcel Service, Inc.,* 388 F.3d 263, 272 (7th Cir. 2004). To the extent Mr. Dobosz' remark might be considered direct evidence of discrimination, the remark was not made in relation to Ms. Coffey's desire to be promoted.  Nor was Mr. Dobosz involved in any adverse employment action taken in relation to Ms. Coffey.  He wrote the memorandum of May 20, 2003, to document his conversation with Ms. Coffey regarding her leaving work during her scheduled shift. This memorandum, however, did not result in a Corrective Action Notice, and in fact, was later rescinded when Ms. Coffey complained that it was a "restrictive policy" aimed only at her.

Under the indirect method of proof, Ms. Coffey bears the initial burden of establishing a *prima facie* case of discrimination. If the plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to provide a legitimate, nondiscriminatory reason for taking the adverse action. *Farrell v. Butler University*, 421 F.3d 609, 613 (7th Cir. 2005). If the defendant satisfies its burden, the plaintiff must then show that the defendant's explanation was pretextual. *Id.* "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, [and] so long as [the employer] honestly believed those reasons, pretext has not been shown. *Id.* (internal quotation omitted). Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir.2000).

In order to make out a *prima facie* case in a failure to promote claim, a plaintiff must show that she (1) belongs to a protected group, (2) applied for and was qualified for the position sought, (3) the defendant rejected her for the position, and (4) granted the promotion to someone who was not in the protected group who was not better qualified than the plaintiff. *Grayson v. City of* Chicago, 317 F.3d 745, 748 (7th Cir. 2003).

There was no formal training program at Starbucks until the fall of 2003. Prior to that time, Ms. Coffey alleges that she told Mr. Dobosz that she was interested in becoming a Shift Supervisor, but nothing ever happened. Mr. Dobosz ceased being Ms. Coffey's supervisor on May 27, 2003, when he left Store 2551. There was no training program in which Mr. Dobosz could place Ms. Coffey during his tenure as her supervisor.[2]

In July 2003, District Manager Ms. Bailey and interim Store Manager Ms. Hornoffer decided to promote Harold Romerill to Shift Supervisor at Store 2551. At this time, Ms. Coffey's female supervisors did not consider promoting her to the position because Mr. Romerill was more qualified for the job, in that he had a few more months of experience, he had received no Corrective Action Notices, and he had received superior performance reviews. Ms. Coffey was not considered eligible for a promotion at this time because of the incidences of her leaving her job in the middle of her shift to take care of personal matters.

In late 2003, after the formal training program was in place, Ms. Coffey asked her female supervisor, Ms. Marrion, about receiving training for the Shift Supervisor position. She was informed there was no need for another Shift Supervisor at Store 2551. Ms. Marrion offered to call other stores in the area to determine if there was a need for an additional Shift Supervisor, but at that time, Ms. Coffey indicated that she was only interested in working at Store 2551.

---

[2] Ms. Coffey alleges, but submits no admissible evidence in support thereof, that Shift Manager Stephanie Leavitt overheard Ms. Dobosz tell Interim Store Manager Ms. Hornoffer that she should "never promote Pauli." Such hearsay, even if it had been presented in the form of an affidavit from Ms. Coffey, is not sufficient to create a genuine issue of fact. Moreover, in an affidavit, Ms. Leavitt denies telling Ms. Coffey any such thing, denies hearing Mr. Dobosz tell anyone not to promote women or Ms. Coffey, and states that she never heard Mr. Dobosz make any negative statements about women or people of color.

8

Ms. Coffey has failed to present evidence that she applied for and was qualified for the position she sought. Although she spoke to Ms. Marrion about receiving training to be a Shift Supervisor, no further process was initiated because Ms. Coffey told Ms. Marrion that she was not interested in a position other than at Store 2551. No Personal Development Plan was developed nor did Ms. Coffey participate in a coaching class nor did she interview with a District Manager. Accordingly, Ms. Coffey was not qualified to be considered for a promotion to Shift Supervisor. In addition, the undisputed evidence shows that the male employee who was promoted in July (effective October 2003), was more qualified than Ms. Coffey. Ms. Coffey has failed to establish the elements of a *prima facie* case that she was denied training or a promotion because of her gender.

"To state a *prima facie* case of disparate treatment gender discrimination under Title VII, a female plaintiff must show that she: (1) is a member of a protected class, (2) was performing her job satisfactorily, (3) suffered an adverse employment action, and (4) was treated less favorably than at least one similarly-situated male colleague." *Farrell v. Butler University*, 421 F.3d 609, 613 (7th Cir. 2005). Ms. Coffey has not submitted evidence showing that she was performing her job to Starbucks' satisfaction. Starbucks has presented unrebutted evidence that the decision to terminate Ms. Coffey's employment was made by female management staff, Ms. Levis, Ms. Bailey, and Ms. Marrion, because of the incident which occurred on January 22, 2004. On that day, Ms. Coffey used inappropriate language and engaged in inappropriate conduct in front of customers. Ms. Coffey has failed to establish a *prima facie* case of discrimination. Moreover, this same evidence supports a finding that Starbucks made the decision for legitimate, nondiscriminatory reasons. Ms. Coffey has not presented any evidence that Starbucks' preferred reason was a pretext for discrimination.

The court does "not sit as a superpersonnel department that will second guess an employer's business decision" even if that decision was baseless or mistaken, so long as the reason for the decision was honestly believed by the employer. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 889 (7th Cir. 2001). Starbucks is entitled to summary judgment as to Ms. Coffey's disparate treatment discrimination claims.

### 2.    Retaliation

Ms. Coffey alleges that Starbucks retaliated against her after she "stood up to" Mr. Dobosz, after she called the company Helpline, and after she filed a charge with the EEOC. She alleges that Starbucks retaliated when it issued the May 20, 2003 memorandum, reduced her hours, and terminated her employment.

To survive summary judgment on a retaliation claim under the indirect method of proof, a plaintiff "must establish that: (1) she engaged in statutorily protected activity; (2) she was performing her job according to [her employer's] legitimate expectations; (3) despite her satisfactory performance, she suffered an adverse employment action; and (4) she was treated less favorably than similarly situated employees who did not engage in statutorily protected activity." *Luckie v. Ameritech Corp.*, 389 F.3d 708, 714 (7th Cir. 2004).

"Absent direct evidence of retaliation, failure to satisfy any element of the *prima facie* case proves fatal to the employee's retaliation claim." *Hilt-Dyson v. City of Chicago,* 282 F.3d 456, 465 (7th Cir.), *cert. denied*, 537 U.S. 820 (2002).

As noted above, Ms. Coffey states in her deposition that on or about May 12, 2003, when she informed Mr. Dobosz that a male co-worker was drinking on the job, Mr. Dobosz stated that "women  and people of color are great employees so long as they know their place, and you don't know your place."  She alleges that she responded by saying, "Yes I do," and that on May 20, 2003, Mr. Dobosz wrote the memorandum about her leaving work during her shift. To the extent Ms. Coffey argues that she "stood up" to Mr. Dobosz, she has not shown that she engaged in any protected activity. Moreover, the May 20 memorandum did not constitute an adverse employment action. In fact, it was rescinded after she complained that it was a "restrictive policy."  Accordingly, Ms. Coffey has failed to make out a *prima facie* case of retaliation based on the issuance of the May 20 memorandum.

Ms. Coffey alleges that after she called the Helpline, Starbucks retaliated against her by reducing her hours.  First, Starbucks argues that Ms. Coffey failed to allege a reduction in hours in either of her EEOC charges. "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in her EEOC charge." *Cheek v. Western and Southern Life Ins. Co.* 31 F.3d 497, 500 (7th Cir. 1994).  Even if such a claim might be "like or reasonably related to the allegations of the charge and growing out of such allegations," and therefore within the scope of an EEOC charge, *id.*, Ms. Coffey has not presented evidence that Starbucks in fact reduced her hours. The undisputed evidence does reflect that on one occasion, the week of June 2, 2003, a mistake was made by a female interim supervisor in making out Ms. Coffey's schedule. As soon as Ms. Coffey complained, the schedule was revised. Accordingly, Ms. Coffey has failed to make out a *prima facie* case of retaliation in relation to any reduction in hours.

Ms. Coffey alleges that her employment was terminated in retaliation for her having filed her first EEOC charge.  It is undisputed that filing an EEOC charge is protected activity.  Ms. Coffey has failed to establish a  *prima facie* case, however, because she has not presented evidence sufficient to create a genuine issue of fact that she was performing her job in a satisfactory manner.  The decision to terminate her employment was based on Ms. Coffey's inappropriate behavior on January 22, 2004. Ms. Coffey has also failed to present evidence that an employee who behaved in a similar manner but had not filed an EEOC charge was not terminated from employment.

To the extent Ms. Coffey argues that Starbucks' termination of her employment was a pretext for retaliation as evidenced by the state agency decision to award her unemployment benefits because she was discharged without good cause, such decision is not controlling. That decision was based on the fact that the company witness at the hearing had not personally seen Ms. Coffey act out in front of customers.  The company's decision to terminate her employment, however, was based on an investigation and interviews with employees who did witness Ms. Coffey's behavior. In this case, there is no evidence that a mistake was made, meaning that Ms. Coffey did not act out as described

10

by two co-workers. Even if there were evidence of such a mistake, moreover, Ms. Coffey has not shown that Starbucks management did not honestly believe that she lost her composure and acted in an unacceptable manner in front of customers. Accordingly, there is no showing of pretext. In sum, Starbucks is entitled to summary judgment as to Ms. Coffey's claims of retaliation.

### III. Conclusion

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *DeNovellis v. Shalala,* 124 F.3d 298, 305-06 (1st Cir. 1997) (internal quotation omitted). "Without a *prima facie* case, the plaintiff cannot withstand summary judgment." *Hong v. Children's Memorial Hosp.,* 993 F.2d 1257, 1261 (7th Cir. 1993). Here, Ms. Coffey has not come forward with evidence that establishes a *prima facie* case of discrimination or retaliation, nor has she shown that Starbucks' preferred reasons for its actions were pretextual.

Accordingly, Starbuck's motion for summary judgment must be **granted** and Ms. Coffey's motion for summary judgment must be **denied.** Any other pending motions are **denied as moot**. Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED**.

Date: _10/20/2005_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana